UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

United States District Court
Southern District of Texas
ENTERED

JUN 2 7 2011

David J. Bradley, Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA, § <br> Plaintiff, § <br> § <br> V. § <br> § <br> CHARLES WESLEY SNELLGROVE, § <br> Defendant. § | Criminal No. C-11-182 |

## MEMORANDUM OPINION AND ORDER

Charles Wesley Snellgrove (hereinafter "Snellgrove" or "Defendant") filed a Motion to Suppress Evidence (Firearms and Statements) [Doc. No. 13] in this case on March 25, 2011, in the Corpus Christi Division of the Southern District of Texas. The Government responded to this Motion on April 21, 2011 [Doc. No. 19]. That same day, both District Judges of the Corpus Christi Division recused themselves from this case, and the case was reassigned to this Court. This Court held a hearing to address the Defendant's Motion to Suppress and the Government's Response. The Parties agreed that the Court should consider the evidence adduced at the hearing not only for suppression purposes, but also for purposes of a bench trial on the issue of guilt or innocence. If the Court denied the suppression motion, the parties agreed that the Court should consider all of the evidence and enter a verdict. The Court, having assured itself that the Defendant knowingly and voluntarily agreed to such a procedure, accepted Snellgrove's waiver of his right to a jury, agreed to abide by the agreement and suggested procedure, and announced that it would consider the parties' arguments and evidence and issue a ruling. This Opinion constitutes that ruling.

I.    **Facts of the Case**

The following facts are undisputed. In February of 2011, Deputy United States Marshals

from the Corpus Christi Division attempted to execute an arrest warrant on a man named David Frost for violating his Supervised Release; however, they could not locate him. Charles Wesley Snellgrove was a known associate of Frost, so the marshals included Snellgrove's known addresses in their search. On February 7, 2011, the marshals, seeing a truck registered to a Charles Wesley Snellgrove, arrived at the home of the Defendant's sister, Amy Larrivee. Neither Snellgrove nor Frost was there, but Larrivee informed the marshals of the location where Snellgrove was living. Later in the day, the marshals, along with members of a fugitive task force (in all 9 to 11 agents), went to the home of the Defendant and his girlfriend, Jacqueline O'Brien. (There were a number of law enforcement agents involved because both Frost and Snellgrove were known members of the Aryan Brotherhood.) The home was rented in O'Brien's name, but the Defendant lived there as well. The marshals and officers surrounded the house, knocked on the door, and when it was opened, some of them went inside. These officers searched the home and found a 12 gauge shotgun with a barrel that measured 16 inches in length (a "sawed-off shotgun") hidden in the box spring in a spare bedroom.[1] The Defendant admitted to the marshals that the shotgun belonged to him. The marshals then notified the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and two ATF agents came to search the house. Both O'Brien and the Defendant signed consent forms allowing the ATF agents to search the entire residence. The ATF agent advised the Defendant of his *Miranda* rights,

---

[1]There was some suggestion that the marshals may have exceeded the scope even of any search that was consented to by looking under the bed in the spare room. The Defendant introduced evidence that the bed was less than 8 inches off the ground and that David Frost, the man being pursued, was about six feet tall, 150–160 pounds. Stuffing a body that size under a bed only 8 inches above the ground admittedly at first blush appears difficult, but Deputy Askew testified that the marshals have in the past found people hiding *in* hollow box springs. As such, and setting aside the consent issue, the scope of the marshals' search seems reasonable given the quarry that they were seeking.

but the Defendant agreed to give a statement without his attorney present, admitting that the firearm was his.

The parties for purposes of the bench trial on guilt or innocence also stipulated to the following:

1. New England Firearms, model Pardner SBI, 12 gauge shotgun, serial number NJ305102, is a firearm in operating condition manufactured after 1898;

2. that said firearm was made in Massachusetts;

3. that said firearm being found in Texas affects interstate commerce;

4. that the barrel of said firearm was less than eighteen (18) inches;

5. that the Defendant did not register said firearm in the National Firearms Registration Transfer Record;

6. that the Defendant has been previously convicted of a felony offense, which is a crime punishable by imprisonment for a term exceeding one year, and further that he had obtained this conviction prior to February 7, 2011; and

7. that on or about February 7, 2011, the Defendant knowingly possessed said New England Firearms, model Pardner SBI, 12 gauge shotgun, serial number NJ305102.

The purpose of this stipulation, when combined with the evidence adduced at the hearing, was to provide the Court with all the necessary evidence to determine the Defendant's guilt or innocence on the charges of felon in possession [18 U.S.C. §§ 922(g)(1) and 924 (a)(2)] and possession of a firearm not registered in the National Firearms Registration and Transfer Record [26 U.S.C. §§ 5861(d) and 5871], if this Court eventually denied the Motion to Suppress. The Court accepted this stipulation.

Both parties agree to the stipulation and the facts described above. The dispute between the two parties concerns the manner in which the marshals entered O'Brien's home; and the versions

presented by the two sides are essentially diametrically opposed. At the hearing, two marshals, Deputy Chris Askew and Deputy Don Snider, testified as to the events surrounding the search; their descriptions of the events substantially coincide. In their version of events, the marshals first went to the home of Defendant's sister, Amy Larrivee, looking for the Defendant (and/or David Frost), after having noticed a white Chevy pick-up truck in the front that was registered to Snellgrove.[2] The marshals, dressed in bullet-proof vests and with guns unholstered, but at their sides, "approached the house and knocked" and thereafter interviewed Larrivee. She told them that she believed there "was a good possibility [Frost and Snellgrove] were together" and that "she was extremely terrified of her brother Charles Snellgrove." Larrivee also told the marshals that her brother was dating Jacqueline O'Brien and there was a good chance that Frost would be there as well.

The marshals then went to Jacqueline O'Brien's home. They testified that a combination of nine to eleven marshals and fugitive task force officers went to O'Brien's home to search for David Frost. When the marshals arrived at the house, 3 to 4 officers gathered at the front door, with their service weapons drawn, but again at their sides, while the remaining officers surrounded the house. Deputy Chris Askew, the leader of the operation, then knocked on the door of the house; O'Brien answered the door after several minutes, with the Defendant standing a few feet behind her.[3] Deputy

---

[2] It was actually registered to Snellgrove's father.

[3] The marshals testified that they carried out an appropriate "knock and talk" by merely knocking on the door and explaining to the Defendant and O'Brien that they were looking for David Frost. After being told that Frost was not there, they then received verbal consent from both O'Brien and the Defendant to enter the house and confirm that Frost was not there. A "knock and talk" is a "reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." *U.S. v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001). However, "the purpose of a 'knock and talk' is not to create a show of force, nor to make demands on occupants, nor to raid a residence." *U.S. v. Gomez-Moreno*, 479 F.3d 350, 355 (5th Cir. 2007). Therefore, officers conducting a "knock and talk" are essentially

4

Askew testified that he told O'Brien that they were looking for David Frost; she replied that Frost did not live there, and that if they did not believe her, they could come in and check. The Defendant also said that Frost was not there and that the agents could look.[4]

The marshals and task force officers then entered the house and began to search for Frost. One of the officers found a sawed-off shotgun under the edge of the bed in one of the bedrooms. The Defendant stated that the gun was his and that he had it for protection because his prior residence had been robbed. The marshals testified that the Defendant was not under arrest at any point during the search and that he was not in handcuffs when he initially consented to the search. They also stated that they never implied that they were going to force their way into the house if consent was withheld or that they had a warrant to search the premises. They conceded that neither O'Brien and Snellgrove was told that they could refuse entry of the marshals. After the discovery of the gun, ATF agents were called. Before the arrival of the ATF agents, the Defendant was placed in handcuffs by the marshals.

One of the ATF agents who arrived at O'Brien's house, Brian Garner, testified that upon

---

limited to knocking on the door and asking investigative questions or requesting consent to conduct a search. When their actions go much beyond that, the Fifth Circuit has held that the "knock and talk" is improperly executed and constitutes a Fourth Amendment violation. *Id.*

[4]Deputy Snider testified that he did not remember if the Defendant said anything about consenting to the search or not; but, ultimately, Snellgrove's consent to search is irrelevant if Ms. O'Brien, the house's lessee, gave voluntary consent. Ms. O'Brien and the Defendant were common occupants of the house, and "when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the Defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *U.S. v. Matlock*, 415 U.S. 164, 171 (1974).

arriving, he spoke to O'Brien. He told her that she was not under arrest and that she was free to leave if she wanted. He then explained what they were searching for and that she did not have to consent to their search. She then read and signed the consent form. Agent Garner testified that when he spoke to O'Brien she "looked pretty calm" and did not appear to have been crying or unfocused. After searching the bedroom, with O'Brien's consent, Agent Garner spoke to the Defendant. He showed the Defendant the ATF form and read him his rights, and the Defendant waived his rights, signed a Miranda form, and signed a consent form to search the house. During that subsequent search, Agent Garner found a disassembled rifle, an empty syringe, and a "little baggie with what looked like . . . methamphetamine residue."[5] The ATF also took possession of the sawed-off shotgun. Garner stated that the Defendant readily admitted that the sawed-off shotgun was his.

The Defendant's witnesses—the Defendant's sister (Amy Larrivee), O'Brien, and the Defendant—testified to an entirely different version of the marshals' conduct. According to their testimony, the marshals and task force officers simply barged into their homes, both Larrivee's and O'Brien's, without asking for permission either to enter or to search. Amy Larrivee testified that the marshals arrived at her house on February 7th at around ten o'clock in the morning. She looked outside her window and saw a "bunch of men with guns pointed at [her] telling [her], police, open up." She said that she saw the handle of her front door turn, and then the officers, who were all "geared up" with guns drawn and pointed at her, "just bum rushed [the door]." She also stated that the officers were "cursing at [her]" and "calling [her] . . . a drug addict [and] a liar." She testified

---

[5]Although ATF found the disassembled rifle and the bag with methamphetamine residue, the indictment against Snellgrove charges him only with offenses related to the sawed-off shotgun.

that she never gave them permission either to enter her house or to search. Nevertheless, the officers began to search her house anyway and kept their guns pointed at her, even "at the back of [her] head," throughout the search. She cooperated with them because she was "petrified." At some point, the officers put her in handcuffs because they suspected her of having drugs in the house and called the Corpus Christi Police Department to come investigate.[6] When the Corpus Christi police officer arrived, Larrivee testified, he was "very nice" and "introduced himself by name and explained to [her] what he was doing."

O'Brien and the Defendant testified to a similar experience. They testified that they were at home on February 7, 2011, somewhere around noon, when they heard a loud knock on the door. When O'Brien opened the door, she saw several officers, dressed in regular clothes, who were armed, but with their guns holstered. They ordered her in a "very stern" voice to step outside. She said that she did not know that she could refuse to allow the officers into her house, and that the officers never asked her permission to enter or explained to her that she was free to refuse consent. Instead, they immediately went inside her house.

Less than half a minute later, the officers told the Defendant to step outside. While most of the officers were in the house, two marshals began questioning O'Brien and the Defendant about David Frost. After about 15 or 20 minutes, the officers called the Defendant back into the house and told him that they had found the sawed-off shotgun. They then handcuffed the Defendant and took

---

[6]According to Larrivee, she had some "moisture rocks" that she kept for a pet lizard and the officers suspected that they were, in fact, illegal drugs. They called the Corpus Christi police to come and identify the substance. This identification later proved the "rock" substance was not an illegal drug.

him to a couch, where he remained throughout the rest of the search. The Defendant stated that he admitted that the gun was his, but he was still unable to tell the marshals the whereabouts of David Frost because he did not know it. Although he cooperated with law enforcement by giving them the addresses of other people on their "to do list," he asserted that when he could not give up David Frost to them, the marshals called ATF regarding the gun. In the meantime, while the Defendant was handcuffed on the couch, other officers were interrogating O'Brien outside. She said that one of the marshals threatened her, telling her that he would destroy her career and strip her of her credentials and certifications, which include a nurse's license and a doctorate of nursing, if she did not cooperate.

Both O'Brien and the Defendant testified that the situation changed when the ATF agents arrived. O'Brien said that the ATF agents treated her much more respectfully, showing her their identification and explaining that she was not under arrest and that she did not have to consent to a search. Because she "had nothing to hide," she gave the ATF officers consent to search. Snellgrove also signed an ATF consent form to search "because there [was] nothing else to find. They had already found the shotgun." However, while both O'Brien and the Defendant admitted that they consented to a search after the ATF agents arrived, they insisted that they did not consent to either the marshals' initial entry or their search, the latter of which led to the discovery of the shotgun.[7]

---

[7] Neither party has seriously argued that O'Brien's and Snellgrove's subsequent consent eliminates the need for the court to decide which version of the facts it believes. A subsequent consent can in some circumstances cure any Fourth Amendment problems. A Fourth Amendment violation may be vitiated if (1) the subsequent consent was voluntarily given and (2) it was "an independent act of free will." *U.S. v. Chavez-Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993). "The first prong focuses on coercion, the second on causal connection with the constitutional violation." *Id*. This Court finds that even assuming that consent was voluntary,

8

## III. Discussion

"A warrantless intrusion into an individual's home is presumptively unreasonable unless the person consents or probable cause and exigent circumstances justify the encroachment." *United States v. Jones*, 239 F.3d 716, 719 (5th Cir. 2001). Although consent creates an exception to this general presumption, such consent is valid only if, based on the totality of the circumstances, it was knowingly and voluntarily given. *United States v. Olivier-Becerril*, 861 F.2d 424, 425 (5th Cir. 1977). It is the government's burden to prove by a preponderance of the evidence that consent was voluntary. *United States v. Hurtado*, 905 F.2d 74, 76 (5th Cir. 1990) (en banc).

The Fifth Circuit employs a six-factor test to evaluate whether consent is voluntarily given. *United States v. Jenkins*, 46 F.3d 447 (5th Cir. 1995); *cf. Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27 (1973) ("[W]hether a consent to a search was in fact 'voluntary' . . . is a question of fact to be determined from the totality of all the circumstances."). They are: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." *Jenkins*, 46 F.3d at 452 (citing *Olivier-Becerril*, 861 F.2d at 424–25). "[N]o one of the six factors is dispositive." *Id.*

This case presents a somewhat unusual scenario. Both sides agree on the applicable law and,

---

which in O'Brien's case it might have been, there is strong doubt that the second prong of this test is met in the consent given by either O'Brien or Snellgrove. Consequently, the Court will not consider the consent and subsequently signed consent forms obtained by the ATF agents as having any effect in this case. *See also U.S. v. Gomez-Moreno*, 479 F.3d 350, 357–58 (5th Cir. 2007); *U.S. v. Hernandez*, 279 F.3d 302, 307 (5th Cir. 2002).

more importantly, both sides agree that if the other side's version of the facts is correct then they lose under the applicable law. Phrased differently, the Government conceded that if the Court found Snellgrove's version of the facts to be accurate, then its search was not constitutional and the basis for the two charges (i.e., finding the gun) would not withhold scrutiny. The Defendant, on the other hand, conceded that if the Government's version of the facts concerning the search was accurate, then the search was valid, and if valid, given the Defendant's criminal history and stipulations of the parties, he would be guilty of the charges alleged against him. Thus, the primary issue that faces the Court is a matter of credibility of the witnesses—which side's version of the search does the Court as the fact finder believe.

The Court finds the Government's version of the search in question to be more credible. While there is no doubt that the marshals presented themselves in force at the O'Brien-Snellgrove residence on February 7, 2011, neither Snellgrove nor O'Brien was unduly intimidated. The Court finds the evidence that they consented to the search worthy of belief. First, both the Defendant and O'Brien had sufficient education and/or experience to understand their rights. Snellgrove is a member of the Aryan Brotherhood who has had prior experience with law enforcement and was familiar with his rights vis-a-vis the issues in this case. No evidence was presented to the effect that O'Brien had any criminal history,[8] but she holds a doctoral degree in nursing and is consequently not altogether lacking in sophistication. Furthermore, having been informed that the officers were looking for David Frost and knowing he was not present, O'Brien and Snellgrove felt that the

---

[8]O'Brien testified her last encounter with law enforcement was in the 1980s for rolling through a stop sign.

10

officers had nothing to find. O'Brien, when she gave consent to the search, did not know of the existence of the gun and as such had no reason to oppose the request to search. Snellgrove knew of the gun's existence, but also knew it was well-hidden and that it would likely never be found if the officers performed a casual search looking for a human. It was somewhat unfortunate for him that an officer found the gun while looking to see if Frost was hiding under a bed. For these reasons, and based upon the relative credibility of the witnesses, the Court finds that O'Brien and the Defendant: (1) consented to the search that ultimately revealed the sawed-off shotgun; and (2) that this consent was not the result of any duress exerted by law enforcement.

Conversely, the Court finds the testimony of the Defendant, Jacqueline O'Brien, and most especially Amy Larrivee to lack credibility. To this Court, Ms. Larrivee's testimony seemed greatly exaggerated; and the strong resemblance between these two alleged incidents of police misconduct is too coincidental to be credible.

That being the case, this Court finds that: (1) consent was given for the search that lead to the discovery of the sawed-off shotgun; (2) that the consent was not the result of coercion; (3) that both O'Brien and the Defendant cooperated with law enforcement throughout the investigation, the latter to the point of even giving them locations of other individuals that they were seeking; (4) that both the Defendant and O'Brien volunteered to the law enforcement agents that they could search; (5) that both of them had the intelligence and sophistication (albeit in different ways) to know that absent consent a warrant would be needed to search a house; and (6) that both Ms. O'Brien and Snellgrove had the belief that nothing incriminating would be found (Snellgrove due to the location of the gun and O'Brien due to the fact that she did not even know the gun was there). Given these

11

facts and weighing them as per the dictates of the Fifth Circuit, this Court finds that the consent to search was voluntary and that the search was constitutionally valid, despite the lack of a warrant. Therefore, the Motion to Suppress [Doc. No. 13] is **DENIED**.

While most of the evidence presented at the hearing focused on the physical search of the O'Brien-Snellgrove residence, the actual motion also raises issues about certain statements that the Defendant made after the gun was discovered. The parties basically conceded that if the search was valid, the statements should not be suppressed. This Court agrees. However, and more importantly, this Court need not rely solely on the existence of consent with regard to these statements because Snellgrove testified at the trial/hearing to all pertinent facts contained in the statements. The Court can rely solely on that testimony at trial to find that it was Snellgrove who acquired, hid, and possessed the firearm that is the subject of all of the charges.

The Court, having denied the Motion to Suppress, now proceeds to issue of guilt or innocence. It hereby finds the Defendant guilty as charged as to both counts (one and two) in the indictment. In addition to the Stipulation, Snellgrove testified he had possession of the gun and had purchased ammunition for it. He also testified that he had previously been convicted of felonies, including a prior one for being a felon in possession of a gun, and that he knew it was illegal for him to have the gun in question. He testified that it was his gun (although he did not acquire it with the prior owner's permission) and that he took full responsibility for it.

Since the Court has found the Defendant guilty, the probation office is ordered to prepare a presentence investigation report as per the schedule set out below. The Defendant is cautioned that the investigation by the Probation Office will include an interview of the Defendant, and the

Defendant should have his lawyer present for that interview.

The remaining schedule for this case is set as follows:

1. That the investigation and preparation of the presentence report be completed by **August 15, 2011**.

2. That immediately thereupon the pre-sentence report shall be made available to defense counsel and counsel for the government who must obtain the report at the probation office on the city of the sentencing court either personally or through an agent. Provided there are no delays, alternative delivery via express mail, messenger, or certified mail is authorized. Counsel shall make arrangements for the delivery, at his/her own expense, and confirm those arrangements in writing with the probation officer assigned to the case. Delivery via facsimile or e-mail is authorized.

3. Counsel shall file objections in writing to the report (including the alleged facts of the offense and applicability to the sentencing guidelines) by **August 29, 2011**. If there is no objection, likewise a statement signed by Counsel and the Defendant shall be filed.

4. After further investigation, the presentence officer shall submit a final report by **September 12, 2011**.

5. This case is set for sentencing hearing on **October 3, 2011** at **8:30 a.m.**

Signed this the 27th day of June, 2011.

Andrew S. Hanen
United States District Judge